# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

PIC GROUP, INC.                                                                       PLAINTIFF

VS.                                              CIVIL ACTION NO. 1:09-CV-662-KS-MTP

LANDCOAST INSULATION, INC. AND
ZURICH AMERICAN INSURANCE CO.                                    DEFENDANTS
DEFENDANTS

### Interim Status Report of Special Master, Craig Ball

**Status**

The Court tasked me "to investigate and advise the Court concerning the nature, extent and sufficiency of the identification, preservation, collection, search, processing and production by LandCoast (including its officers, agents, employees, contractors and counsel) of potentially responsive and relevant information–particularly electronically stored information (ESI)–as it relates to discovery in this cause." The investigation was to include my assessment of "claims that archived documents and computer data were lost; the efforts made to preserve, recover or replicate such information; and the ability, necessity, cost and complexity to retrieve it."

This is an interim status report because my work is not done. Recognizing that the parties will soon be in trial, I've interpreted my appointment as not limited solely to fact finding about past failures but geared also to helping the parties get back on track in terms of rectifying gross deficiencies in production. I hope this will enable the parties and the Court to conclude satellite disputes about discovery and return focus to the merits.

LandCoast's e-discovery compliance in this case was wholly devoid of competence, yet only once motivated by guile. There's still time and capability to rectify matters, and mitigation efforts are already underway, reflecting much improved communication and cooperation between the parties.

I am optimistic that, with the dedication of resources and effort now seen and with the parties continuing cooperation, LandCoast will be able to plug the holes in its production in sufficient time for Plaintiffs to assimilate the data and be prepared to proceed to trial. Rather than opine whether the delay in production has irreparably prejudiced Plaintiffs by their lacking certain information at deposition, my goal is to see that LandCoast implements reasonable measures tending to insure that the absent information is found

1

EXHIBIT

1

and produced without further delay. I expect this will best permit the parties to address the ultimate harm with the Court, as they are best situated to do so. I will have further recommendations respecting cost shifting and sanctions once LandCoast's additional production is concluded.

### ESI Issues

The crux of the dispute between the parties is the alleged failure by LandCoast to preserve relevant ESI and the concern that discoverable information may have been lost or even intentionally destroyed to prevent its disclosure. These concerns stem, in part, from testimony by Robert Maw, LandCoast's IT Manager from January 18, 2009 through February 5, 2010. Mr. Maw testified he was not instructed to preserve ESI in connection with this litigation until sometime in 2009, after a server or servers had already "crashed" and were "wiped" in a restoration effort. Questioned about the existence of backups, Mr. Maw testified that the e-mail server was not backed up during his tenure at LandCoast.

Mr. Maw further described how he'd thoroughly wiped the computer used by Tom Guidry, LandCoast's Manager of Operations, in January 2009 (2-3 months after the scaffold collapse). Maw claimed that none of Guidry's e-mail was preserved before the wipe. Mr. Maw also related that, during the summer of 2009, he replaced the hard drive on the laptop used by LandCoast's Vice-President, Dan Anderson, and then lost the original drive. Anderson's laptop was then stolen from a parked car in December 2009. All of this left the clear impression that Anderson's ESI, like Guidry's and the company's e-mail, was gone despite the attachment of a duty to preserve potentially responsive evidence.

### Summary of Work

I began my investigation by reviewing pleadings and by asking each side to furnish specific information for my review. I read the testimony of Craig W. Marks, Andrew Mozingo, Robert J. Maw, III and Jeffrey Hopkins, and invited both sides to furnish other exhibits and testimony which they thought would assist my understanding of the issues. I then convened a joint teleconference so that both sides could set out their efforts and concerns related to my investigation.

On March 18, 2011, I travelled to LandCoast's headquarters in New Iberia, Louisiana for the purpose of inspecting their systems and acquiring data from sources I deemed likely to hold responsive data sought in discovery. Though I acquired terabytes of data, I did not acquire all, or even most, of the ESI held by LandCoast, electing instead to image several machines held by key custodians and only those areas of the servers that appeared relevant. My purpose was not to substitute my own efforts for those required of the defendant, but, instead, to secure a suitable sample of LandCoast's data to enable me to assess the sufficiency of LandCoast's prior discovery efforts and the

scope of future efforts. I received the utmost cooperation and assistance from LandCoast's counsel in attendance, Nancy Brumbeloe, and its ESI consultant, Jerry Hatchett.[1]

My analysis of the data I acquired is ongoing, and it's enabled me to point counsel to deficiencies and help them arrive at ways to address them. We have had weekly status conferences since my appointment to insure that efforts are proceeding apace. Unfortunately, my analysis has uncovered some conduct demanding the Court's intervention that cannot be explained by miscommunication or simple negligence. One intentional act of data destruction warrants a stern response from the Court.

## Opinions and Recommendations

LandCoast's failures are many and warrant criticism. These failures caused LandCoast to conclude that much of the information sought in discovery was gone. Consequently, they told Plaintiff production was impossible due to, *inter alia*, computer theft, drive wiping and disc failure. This may be LandCoast's most egregious failure because my examination of the systems and media on LandCoast's premises in New Iberia demonstrates that much—and perhaps all--of what the Plaintiffs seek in discovery is readily available and principally resides in places that one would routinely look for same. To paraphrase Mark Twain, the reports of its death are greatly exaggerated.

The tragic accident at the heart of this case occurred on November 4, 2008, injuring six LandCoast employees and killing a seventh. The cause to anticipate claims and litigation was immediate and unequivocal. An obligatory OSHA investigation was coming. Workers compensation claims were certain to be made. Rented equipment had been destroyed.

Almost at once, the Plaintiff made the demand for indemnity at the heart of this suit. Even if LandCoast unfathomably failed to anticipate its exposure, it clearly contemplated claims for *its own* losses. In my opinion, the obligation to preserve evidence attached on or about November 4, 2008.

Yet, it was not until April of 2010, nearly 1-1/2 years later, that LandCoast paid any meaningful attention to e-discovery. I found no evidence of any corporate policy, procedure or concerted effort on LandCoast's part to preserve electronic evidence. From the standpoint of preservation of ESI, LandCoast's efforts in the year and one-half following the incident appear confined to asking two employees to save their "file," and compile copies of e-mails sent to or received from the Plaintiff and Patent Scaffolding,

---

[1] To minimize business disruption, acquisitions of this nature entail arduous hours. We worked until 2:30am on Saturday and until dawn on Sunday.

3

and making a tardy request to preserve data met by a claim by the IT Manager that it already been lost.

There was no formal, timely litigation hold instituted with key personnel, none with IT staff and insufficient follow up even as to the minimal preservation effort begun with the two employees.[2] There was otherwise no affirmative collection or sequestration of data. In fact, I saw no evidence that LandCoast or its counsel engaged anyone to preserve, collect or examine potentially responsive ESI until long after the collapse.

When I was appointed, more than two years after the scaffold collapse, LandCoast and its counsel still had no clear picture of the volume and nature of the electronically stored information held by LandCoast or how much ESI might relate to this case. It further appeared that neither current nor prior defense counsel appreciated how far their perception of the work done to produce ESI fell short of the reality of its non-production.

Based on the information I've reviewed, which includes extensive privileged communications between LandCoast and a succession of lawyers, none of the defense counsel sought or possessed a rudimentary appreciation of LandCoast's information systems or sources of relevant ESI. Accordingly, counsel were ill-equipped to ask the right questions about LandCoast's digital evidence, frame instructions for preservation and search or assess the adequacy of the meager information produced. E-discovery was treated as a nuisance—ignored for as long as possible, then given as little attention as feasible. Current counsel are doing better now, aided by their engagement of a qualified expert; but it's still early in this "new leaf" phase, and it will be weeks more before I can advise the Court if supplementary production is reasonably complete.

### Work of Andrew Mozingo

In April 2010, eighteen months after the scaffolding collapsed, LandCoast's counsel enlisted the assistance of Andrew Mozingo, a computer technician from Purvis, Mississippi, to attempt to identify ESI responsive to discovery.

Unfortunately, Mr. Mozingo was no expert. He was a well-intentioned novice given unreliable information,[3] and, though Mr. Mozingo claims he tried to convey to counsel

---

[2] A week after the collapse, Craig Marks sent an e-mail to Donnie Sullivan and Dan Anderson requesting that they furnish their files and their e-mail communications to and from PIC Group and Patent Scaffolding. Clearly, there was actual awareness on the parts of Craig Marks and defense counsel (who prompted the request) that there would be relevant electronic evidence in the custody of LandCoast personnel and that such ESI needed to be preserved and searched.

[3] When engaged, Andrew Mozingo was advised that LandCoast's mail server had been wiped in the summer of 2009. He accepted this and took no steps to determine if it was true or how much data might have survived such a wipe. He did not consider the possibility that the company employed backups and did not look to see if there were any backups. In essence, he collected data from a source from which he was told to expect little data, undertook a few searches of that source and "dumped" the result on counsel. Neither he nor counsel seems to have questioned why there would be *any* messages found on

4

that he'd actually done very little and was "overwhelmed," he failed in this as well. As a result, most of what should have been found and produced was never considered and is only now emerging.

The following excerpts from Mr. Mozingo's testimony are illuminating:

> A. (By Andrew Mozingo, p.38, L.8) In this case, on the case that we worked in here, I was just told to just dump -- just take search terms and dump e-mails, dump documents off and send them. That's what I was told to do. So I didn't do any literal like reading documents, reading e-mails, trying to figure out what was going on and involved in the case.
>
> Q. (by Mr. Krouse for PIC Group) So no forensic analysis was done in either -- with the Marks laptop, Sullivan laptop and the e-mail server?
>
> A. That's correct. I was just dumping basically.
>
> Q. Okay. And dumping for a layperson means what?
>
> A. It means extracting the volumes. You take the e-mail server, Craig Marks' hard drive, and then I took Donnie Sullivan's hard drive on the 15th, take all those together, you have a plethora of information. So dumping is taking key words -- key words that I was given --
>
> Q. From Exhibit 3?
>
> A. -- from Exhibit 3, those key words and trying to take what I can out of those key words and taking them off, put them on the hard drive, external drive, and sending them off to Dukes and Dukes. That's what I was told to do.

---

the server with dates *pre-existing* the wipe. Yet, there were. Despite this glaring inconsistency, no one ever said, "Hey, this can't be right. Are we sure this drive was wiped?"

There is no telling what Mr. Mozingo did. In an April 12, 2010 e-mail to counsel, Mr. Mozingo stated that he conducted a single search using the term "PIC." In an April 20, 2010 invoice, Mr. Mozingo billed for running searches "using keywords such as 'PIC', etc." In his sworn testimony on October 19, 2010, Mr. Mozingo testified that, instead of using the hundreds of terms furnished for his use, "I just went through the main key search terms that I assumed were relevant, like 'accident' because I knew there was an accident." (Mozingo deposition at page 129, line 22). One month after his deposition, Mr. Mozingo produced lists of keywords to counsel in which he claimed to have searched 41 keywords for one custodian's data and 35 terms for another's. These lists do not include the terms "PIC" or "accident." On April 1, 2011, Mr. Mozingo claims to have used "the same search terms" for all three sources he searched (an Exchange server file and two employee's machines), despite the fact that he produced *different* lists of terms for each.

Moonlighting from his day job and anxious to gain some experience, Mr. Mozingo did not let on that he was in over his head. Unable to distinguish an expert from a novice, counsel mistakenly assumed that Mr. Mozingo knew what he was doing.

5

P. 129, L.2:

Q. (by Mr. Krouse for PIC Group) [W]hat I'm trying to really drive at here with you is that, for example, with Michael Morton, Mick Morton, where is their e-mail box? Did you capture that?

A. I don't know if I did or didn't.

Q. Okay.

A. I don't know if I did or didn't. Again, I was looking for direction from the attorneys.

Q. Right.

A. After I -- I was told to go get the images. I went and got the images. I got back to my office. I was looking for direction from the attorneys. I got absolutely almost nothing, no direction. So I started working -- my first process of working was -- is to take these search terms, and I didn't go through all 200 or 150 of them. It would be virtually impossible because of the plethora of data. So I just went through the main key search terms that I assumed were relevant, like "accident" because I knew there was an accident.

Q. Sure.

A. Like "plant" -- whatever the name of the plant was --

Q. Daniel.

A. Don't even remember that. "Plant Daniel" I did a search term. Search term on "Marks" and "Sullivan" and just a few of the things, items that I thought. Once I got this plethora of data back, I started asking, What would you like me to do at this point? I got really no direction, except can -- and I -- and I said, Here's some of this stuff I presented. I assumed that they were going to come back to me and say, All right. Now you need to look at this, this, this and this. That never happened.

Q. Okay.

A. What happened was I said, Here's a plethora of information already from five or six or ten key search terms. What do I do now?

Q. Right.

A. Got nothing. So then the next thing I got is, Hey, can you put it in a .pst file? And I said, Okay, fine. I'm not sure how to do that. So I used that X1 program to take all the information I had and just combine it in a .pst file and send it to them.

Q. Now, did Mr. Williams ever come to you at Purvis or you go to his office in Gulfport and say, you know, Look, we got to pare this thing down. It's just not in the organization that I need? Was there any kind of discussions like that or meetings?

A. Not with me.

Q. Okay.

A. And, again, I was -- I was overwhelmed by the amount of information from just ten search terms. So those -- I didn't go through a hundred and however many there are. It would have taken a year to do that.

Q. Right.

A. And literally reams of data that -- and so I didn't have much direction. I was like, What do you want me to do next? And I never got anything back, except, Can you just put all this in a .pst file and send it to me?

Q. And ship it them, that's what you did, and you didn't hear back from--

A. That's what I did, and I didn't hear anything back. And I was actually surprised. You know, I was like thinking that I was going to hear something back saying, Okay, have you looked at this? Have you been more specific with this? Have you looked at this name? Have you gone -- nothing.

Q. Right.

A. That was the end of it.

Mr. Mozingo's efforts were the sum total of e-discovery achievement in this case until the last few days.

**Fortunately, the information that Mr. Mozingo missed and Mr. Maw said was wiped was sitting on a hard drive connected to the server.** It was aptly named "Backups" and accessible on the network as LandCoast's W: drive. It holds what appears to be a quite complete set of company e-mail from before the mail server "wipe." It holds hundreds—if not thousands—of responsive items (although I expect many will prove cumulative of material obtained from other sources or be withheld as privileged).

7

But this easily accessible backup is just one instance of a host of other sources that I noted held responsive information. None of it was hard to find, and no special skills—certainly no digital forensics talents--were needed to find it. It just required a look, and had that look occurred closer to the time of the request, the task would have been uncomplicated by the volume of data that has accumulated since.

**What's Really Lost?**

Certainly, there is a corpus of information that can never be reviewed or produced because it was not protected against foreseeable loss due to failure, corruption or theft. Witnesses described little in the way of routine backup procedures at LandCoast, which created an expectation, reinforced by counsel, that potentially responsive data was wiped and gone.

Peculiarly, on looking, I discovered there was far *more* responsive information resident on the various LandCoast servers, machines and storage media than LandCoast's witnesses acknowledged. My opinion is that they weren't acting in bad faith to conceal the information so much as they simply had no idea what they had and exerted little effort to investigate.

I reached a different conclusion with regard to the data on employee Dan Anderson's laptop, which was stolen from his parked car at a hotel more than a year after the accident. Because there's no backup, whatever Anderson hadn't shared with others via e-mail during the post-accident investigation and discussion is likely permanently lost.

Robert Maw testified that Mr. Anderson's laptop hard drive was failing some months before the theft, so Maw imaged its contents to create a backup. Maw subsequently misplaced that drive image and "could not locate it anywhere." (Maw Deposition, P. 29, L.18). Consequently, except for e-mail, whatever was on Dan Anderson's laptop is truly gone unless that image surfaces.

Why wasn't Anderson' laptop the subject of post-accident preservation efforts? The process appears to have been initiated in a reasonably prompt way by LandCoast's Manager of Legal Affairs, Craig Marks, in November of 2008. Marks advised Dan Anderson of defense counsel's request that Anderson furnish his "entire file" including "any/all materials you have reflecting communications with either PIC or Patent about the boiler scaffolding system." Marks further requested that Anderson "retrieve and save on a disc all e-mails from or to you to either PIC or Patent about scaffolding in general and the boiler in particular."

Anderson responded that he didn't have a disc and inquired whether he could simply forward his e-mail. Marks agreed, and Anderson then forwarded seven (7) e-mail exchanges to Marks. However, Anderson did nothing further for a full month, prompting a second request by Marks to Anderson. Anderson responded that he was busy and

8

would get on it next week. When ten days elapsed with no action by Anderson, Marks sent a third request for Anderson's file on December 22, 2008. That is where the trail grows cold, and despite further inquiry on this point, I can find nothing to demonstrate that Mr. Anderson's file materials were ever secured.

All in all, had the loss of Anderson's laptop occurred in the context of an otherwise reasonable and diligent e-discovery effort, it would have been of little consequence. Here, it is only a further indication of the generally slipshod attention LandCoast directed to meeting its e-discovery obligations.

### Craig Marks' Actions

Craig Marks is the person at LandCoast with primary responsibility for discovery in this case. He is the principal liaison with outside counsel. Neither Mr. Marks nor LandCoast's counsel adequately grasped the nature and scope of a litigant's duties with respect to the preservation of electronically stored information. However Mr. Marks well-appreciated the potential for ESI to be evidence because his laptop was equipped with tools specially deployed to eradicate ESI,[4] and he'd been personally implicated by ESI in connection with the prosecution leading to his conviction and disbarment.[5]

But for Mr. Marks' actions preceding my inspection, I have, to date, seen nothing to persuade me that LandCoast's failures to preserve or produce responsive ESI were fueled by anything other than carelessness and an all-too-familiar effort of a party seeking legal justification to prevent an opponent from discovering information the party does not want to produce.

But Mr. Marks' destructive actions were intentional,[6] and their character and timing demonstrate bad faith. Shortly after my appointment, on March 14, 2011, I e-mailed the following instruction to all counsel:

---

[4] I found installed on Craig Marks' laptop several programs whose sole purpose is to protect a user's "privacy" through the destruction and overwriting of records of user activity and, in one case, to defeat the ability of a forensic examiner to recover the contents of deleted files. These antiforensic applications are not illegal, and there is nothing inherently sinister about a user's desire for privacy. However, the installation and use of these applications while under an obligation to preserve ESI and use on the eve of a Court-ordered collection and examination belies any innocent intent or absent-minded oversight.

[5] According to the published proceedings of the Louisiana Attorney Disciplinary Board, Docket No. 05-DB-037 (available at http://ladb.org/nxt/gateway.dll/HC/2006-03-10_05-db-037.htm?fn=document-frame.htm$f=templates$3.0 on 4/26/11), a computer forensic investigation yielded e-mail that shed light on Mr. Mark's misconduct.

[6] I'm obliged to note that the actions I saw were those of a person with access to Mr. Marks' laptop, knowledge of his login credentials and an incentive to destroy its contents. I reasonably attribute these actions to Craig Marks but do not foreclose the possibility that Mr. Marks may accuse someone else of having such, access, knowledge and incentive. I have not been advised that Mr. Marks denies doing what I describe.

### Preservation

I expect parties to act diligently, decisively and with due care to insure that information potentially relevant to this matter is preserved in a manner that will not impede or frustrate my investigation. This requires more than a hope or expectation that data will be retained. Counsel must act promptly and take reasonable and effective steps to anticipate foreseeable data loss or corruption and guard against same. If counsel do not themselves have the knowledge or experience to equip them to know what to anticipate and how to protect against data loss, then counsel must secure prompt assistance from persons who have the requisite knowledge and experience.

It's common for officers and employees to take matters into their own hands in efforts to protect the company or themselves. I will not look charitably on negligent or intentional data destruction that occurs in anticipation of my investigation or during its pendency. You should expect human frailty where data is concerned and take immediate, affirmative steps to insure that individuals do not undertake data destruction or other antiforensic measures to erode ESI.

From experience, I can assure you that no information I've examined has ever been as destructive to the interests of the producing parties as the efforts made to conceal or alter it. It occurs with alarming frequency, undertaken even by people of customarily sterling character. Sometime folks let their proprietary feeling about "their" computer cloud their judgment. Even when computer users claim their motivation was just to eradicate evidence of sensitive personal activities or data, the end result is often significant sanctions.

Please assure your clients and their employees that I don't care about any irrelevant activity or information that has no bearing on the issues before the Court. I've pretty much seen it all before, and it's not what this case is about. My task is not to report on irrelevant downloading of copyrighted music, online shopping or gambling, cheating on taxes, pornography surfing, extramarital liaisons or dabbling in "art photography." The sole exception is a clear indication of a user amassing or trading in child pornography. I must report child pornography trafficking to the authorities, but I trust you wouldn't want me to do otherwise. That aside, the surest way a user can make their most private, irrelevant information the epicenter of the Court's attention is to take steps to hide it.

The material I've reviewed makes clear that LandCoast's counsel promptly communicated these instructions to Craig Marks. My forensic examination of Mr.

Marks' employer-issued laptop reveals occurrence of precisely the data destruction and antiforensic conduct I cautioned against. On March 18, 2011, the day Mr. Marks knew I was coming to collect data for the Court-ordered investigation, Mr. Marks ran a data destruction tool called CCleaner.

CCleaner is a so-called "antiforensic tool;" that is, it's a software program whose purpose is to eliminate and conceal evidence of electronically stored information in ways that frustrate the ability of computer forensic examiners and others to track a user's actions respecting the computer system. The use of CCleaner is promoted as a means by which users can protect their privacy from persons who may gain access to the computer.

As Manager of Legal Affairs for LandCoast, Mr. Marks was the person internally responsible for his employer's compliance with its preservation and production obligations, and I observed that he took an active role in directing (or seeking to direct) the defense of the case. That is, he played the role of in-house general counsel in everything but job title.

Mr. Marks holds a Juris Doctor from Louisiana State University. He practiced as a litigator for many years before joining LandCoast. I am persuaded that Mr. Marks is capable of understanding and did understand not only my directives as this Court's Special Master, but also the broader obligations the law demands in terms of preservation of potentially responsive information and compliance with discovery obligations. When Mr. Marks deployed a data destruction tool in April of 2010 and again in March of 2011,[7] it was not with a misplaced sense that what he did furthered LandCoast's obligations or sailed within any safe harbor of the law. He acted with contempt for the rights of the parties and the Court.

The use of antiforensic tools complicates an examiner's ability to state with certainty what was and was not destroyed. Certainly, I see the absence of records that would have been present but for such actions. I can state with confidence that data was intentionally destroyed, and I can attest that some of the data destroyed memorialized use of particular files as well as the user's online activity. I cannot state that the antiforensic tools used were successful in eradicating information which the Plaintiff was entitled to discover. But for their timing, I would not have thought Mr. Marks' actions

---

[7] On April 9, 2010, Mr. Marks' laptop was acquired (i.e., forensically copied) by Andrew Mozingo in connection with discovery in the instant cause. Immediately before the acquisition, Mr. Marks used a program called "Privacy Protector X-Treme," distributed by StompSoft to delete and obscure data on the machine. My belief, based on review of program logs, is that Mr. Marks had the StompSoft product configured to run daily and simply failed to disable same when the preservation duty attached. However, CCleaner, the tool Mr. Marks used on the day of my arrival to collect data for this Court, was installed after Mr. Mozingo's acquisition and during the pendency of this action. It was executed manually. It's my opinion that it was run expressly to interfere with the Court's investigation.

were tied to the instant litigation. I suspect they were not, but have no proof either way. What Mr. Marks did is further muddy waters already made murky by incompetence and delay.

Because the intentional spoliation appears confined to a single machine, I recommend that this machine be treated differently in the Court's remediation. Ordinarily, Mr. Marks' role as a Manager of Legal Affairs would entitle LandCoast to claim that certain communications and work product found on Marks' laptop are privileged. But here, the entity benefitting from the privilege posted a fox to guard the hen house. The Manager of Legal Affairs managed such affairs by intentionally destroying information. It's now difficult or impossible to assess how the destroyed data might have enabled the Plaintiff to challenge the privilege or demonstrate waiver. Accordingly, I recommend that such bad faith be addressed by the Court ordering that the entire contents of the Marks laptop be furnished to Plaintiff's counsel, unshielded by claims of privilege or challenges to relevance.[8]

I expect to have further recommendations of remedial or punitive actions in subsequent reporting. I appreciate the Court's patience as this investigation proceeds and welcome any inquiries or direction.

Respectfully Submitted,

Craig Ball
Texas Bar No. 01632200
3723 Lost Creek Blvd.
Austin, Texas 78735
TEL: 512-514-0182
FAX: 512-532-6511
E-MAIL: craig@ball.net
WEB: www.craigball.com

---

[8] Severe as this may seem, it is far less Draconian than an adverse inference instruction or striking pleadings--more common remedies for spoliation that I do not feel are warranted here.

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2011, I transmitted the foregoing to chambers via e-mail for filing using the CM/ECF. I further certify that I have served a copy of the foregoing on Plaintiffs' and Defendant's Counsel by e-mail.

Craig Ball
Texas Bar No. 01632200
3723 Lost Creek Blvd.
Austin, Texas 78735
TEL: 512-514-0182
FAX: 512-532-6511
E-MAIL: craig@ball.net
WEB: www.craigball.com